**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Winter Adams,

    Plaintiff,

v.

Independent School District No. 885,

    Defendant.

No. 26-cv-2437 (KMM/DJF)


**ORDER**

---

This matter is before the Court on Plaintiff Winter Adams's Motion for a Preliminary Injunction and Temporary Restraining Order. (Dkt. 8.) For the following reasons, the Motion is denied.

**BACKGROUND**

**A.    No-Trespass Order**

The Court has reviewed the parties' briefing and declarations but briefly recounts only those factual allegations necessary to the resolution of this Motion. During the 2025–26 school year, Ms. Adams's child attended St. Michael Albertville ("STMA") High School, a school within Defendant Independent School District No. 885 ("District"). Ms. Adams and the District communicated by email between November 2025 and April 2026 about her child's education but unfortunately the messages escalated into more frequent and antagonistic emails from Ms. Adams to District staff. The record reflects that Ms. Adams exchanged several dozen emails with school administrators, office staff, and

1

individual instructors. Often these messages were personally condemning District staff for alleged transgressions.

On April 7, 2026, the District issued a Notice of No Trespass Order ("No-Trespass Order") to Ms. Adams. In relevant part, the No-Trespass Order states, "Effective immediately, you are prohibited from entering any property owned or operated by the STMA School District, including but not limited to STMA High School and STMA Middle School West. This Order will remain in effect until September 1, 2026." (Dkt. 8-3 at 24.[1]) It further specifies, "Under this Order, you are not permitted to be on school grounds for any reason, including school-sponsored events, athletic competitions, or parent-teacher conferences, unless you have received prior written authorization from the Office of Superintendent." (*Id.*) The No-Trespass Order explains that the restrictions were necessary to address her "extreme and relentless barrage of emails" that "interfere[d] with the educational environment and the safety of [the District's] staff" and caused "a reasonable basis for the district to be concerned about safety." (*Id.*) The No-Trespass Order also limited Ms. Adams's ability to communicate with the District:

> While this Order is in effect, any communication regarding your child's education must be conducted via email or phone and sent to [email address] or [phone number]. . . . Moving forward, and for the remaining part of the 2025-26 school year, [STMA] Principal [] will not respond to further emails or calls unless the communication is pertaining to new and consequential information that the district determines you would need as a parent to meet the educational needs of your student.

---

[1] Citations are to the ECF pagination.

(*Id.* at 25.) The No-Trespass Order gave Ms. Adams twenty business days to appeal the determination, which she did. (*Id.*; Dkt 1-3 at 2 (appeal).)

On April 26, 2026, counsel for the District sent Ms. Adams a letter ("the Letter") "clarify[ing] the scope of the no trespass directive" and "outlin[ing] time, place, and manner restrictions that will apply to [her] future communications with the District and its employees[.]" (Dkt. 8-3 at 29.) The Letter further detailed the District's concerns with Ms. Adams's behavior, including that her "emails appear[ed] to be designed to intimidate, harass, and instill fear in District employees," and that her "conduct create[ed] a toxic environment for staff and [was] inappropriate." (*Id.* at 30.) The Letter also created a "narrow exception" to the No-Trespass Order's ban from STMA property, stating: "[O]n instructional days, you may drive your vehicle into the front parking lot of the high school for the limited purpose of dropping off or picking up your child near Door A. You may not exit your vehicle or enter the high school building." (*Id.* at 31.)

Regarding future communication with the District, the Letter stated that Ms. Adams's email address would be blocked on April 27, 2026, and that she could communicate with the District about her child's disability accommodations and any other matters through U.S. mail addressed to designated District officials. (*Id.* at 30.) It however carved out an exception if Ms. Adams were to "fil[e] a complaint pursuant to a specific law or pursuant to a District policy that requires the complaint to be filed with a specific person other than [the designated individuals]." (*Id.*) The Letter "encouraged" her to file a complaint if she had a good-faith basis for doing so and informed Ms. Adams that she could contact the District's Executive Director with "any questions about the complaint

procedure that is established in any applicable District policy." (*Id.* at 31.) Finally, the Letter outlined procedures for contacting her child's school regarding absences and other emergencies and for any required meetings. (*Id.* at 31.)

**B.      Communications About Disability Accommodations**

Around April and May 2026, Ms. Adams and District staff also discussed providing her child with a disability accommodation. On April 2, Ms. Adams emailed the District seeking an accommodation for her child under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), suggesting that a plan pursuant to Section 504 of the RA[2] be put in place. (Dkt. 22-10 at 1.) On April 6, the school provided Ms. Adams with information relating to a Section 504 plan. (Dkt. 8-3 at 22.) In response, Ms. Adams reemphasized on April 8 her belief that her child needed a Section 504 plan. (*Id.* at 20–22.) Ms. Adams then signed a "Parental Consent: Section 504 Evaluation" form on April 13. (*Id.* at 26.) On April 24, Ms. Adams and District staff exchanged emails about scheduling a Section 504 evaluation for Ms. Adams's child, which was set for May 19, 2026. (*Id.* at 27–28.)

* * *

On May 1, 2026, this action, which was originally filed in Minnesota state court, was removed to federal court. (Dkt. 1.) Ms. Adams filed this Motion seeking emergency injunctive relief on May 14. (Dkt. 8.)

---

[2] Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, prohibits disability discrimination by those who accept federal funding.

4

**DISCUSSION**

## I.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."[3]

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Choreo, LLC v. Lors*, 164

F.4th 667, 670–71 (8th Cir. 2026) (quoting *id.* at 22). It is Ms. Adams's burden to establish

the need for a preliminary injunction. *Winter*, 555 U.S. at 22 (describing injunctive relief

as "an extraordinary remedy that may only be awarded upon a clear showing that the

plaintiff is entitled to such relief"); *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d

312, 316 (8th Cir. 2009). When a party moves for a preliminary injunction, courts consider

the four *Dataphase*[4] factors:

> (1) the threat of irreparable harm to the movant; (2) the state of
> the balance between this harm and the injury that granting the
> injunction will inflict on the other parties . . . ; (3) the
> probability that the movant will succeed on the merits; and (4)
> the public interest.

*Missouri v. Trump*, 128 F.4th 979, 990 (8th Cir. 2025) (quoting *Wilbur-Ellis Co., LLC v.*

*Erikson*, 103 F.4th 1352, 1355–56 (8th Cir. 2024)).

## II.    Likelihood of Success on the Merits

While no single factor is determinative, the likelihood of success on the merits is

the "most important." *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041,

---

[3] Because the standard for a preliminary injunction and a temporary restraining order are the same, *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022), the Court refers to the Motion as one for a preliminary injunction. *See* Fed. R. Civ. P. 65.

[4] *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981).

1044 (8th Cir. 2020) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)). To meet its burden on this factor, the moving party must show a "fair chance of prevailing, . . . but it need not show that it has a greater than fifty per cent likelihood of success[.]" *Sleep Number Corp.*, 33 F.4th at 1016–17 (8th Cir. 2022) (cleaned up).

Ms. Adams asserts three claims[5] for relief: (1) violations of her procedural due process rights under the Fourteenth Amendment of the U.S. Constitution; (2) First Amendment retaliation; and (3) disability retaliation under the Americans with Disabilities Act and Rehabilitation Act.[6]

### A.    Procedural Due Process

In evaluating a procedural due-process claim, courts analyze (1) "whether there exists a liberty or property interest of which a person has been deprived"; and, if so, (2) "whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). "If the plaintiff cannot identify any protected liberty or property interest of which he was deprived, 'any procedural due process claim

---

[5] While Ms. Adams lists "Declaratory and Injunctive Relief" as a claim, these are forms of relief sought to redress her other claims, not causes of action on their own. *See Wolff v. Bank of N.Y. Mellon*, 997 F. Supp. 2d 964, 979 (D. Minn. 2014) ("A declaratory judgment is a remedy, not a cause of action.").

[6] Ms. Adams's Motion was brought based on the original Complaint, but she has since filed an Amended Complaint. The Court accordingly looks to the Amended Complaint as the basis for this Motion.

necessarily fails.'" *Quinn v. Doherty*, 637 F. Supp. 3d 647, 659 (D. Minn. 2022) (quoting *Beaulieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012)).

Ms. Adams argues that she has a protected liberty interest in "meaningful parental participation in her child's education, including participation in conferences and meetings, communication with school officials, access to school property for lawful educational purposes, and involvement in disability-related decision-making processes." (Dkt. 18 at 8.) Ms. Adams does not cite any cases establishing a protected liberty interest in such actions.

Rather, the caselaw suggests the opposite. While parents "have a fundamental liberty interest in the care, custody, and management of their children . . . this right is not absolute[.]" *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 816 (8th Cir. 2011) (cleaned up). Indeed, "[t]he case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 966 (8th Cir. 2015) (quoting *Combs v. Homer–Ctr. Sch. Dist.*, 540 F.3d 231, 247–48 (3d Cir. 2008) (per curiam)). While it appears that the Eighth Circuit has not squarely addressed the issues raised by Ms. Adams, the caselaw supports the conclusion that neither the No-Trespass Order or the Letter implicates any of her liberty interests. *See Thomas v. Norris Sch. Dist. 160*, No. 8:22CV179, 2022 WL 20668245, at *8 (D. Neb. Nov. 23, 2022) ("Thomas directs the Court to no authority indicating he has a protected liberty interest in visiting the school or attending school events."); *Bender v. Metro. Nashville Bd. of Educ.*, No. 3:13-cv-0470, 2013 WL 3777197, at *6 (M.D. Tenn. July 18, 2013) ("While meaningful communication between parents and teachers may be a laudable policy as a

general matter, it is not required by the Due Process Clause of the United States Constitution."); *Franklin v. Mansfield City Sch. Dist.*, No. 1:14 CV 1163, 2015 WL 7429046, at *8 (N.D. Ohio Oct. 30, 2015) ("While it may be axiomatic that more frequent, earlier, and more comprehensive communications are always to be preferred over lesser degrees of such qualities, it by no means follows that there is a constitutionally protected property interest in a certain amount and quality of communications between the school and a student and his parents."), *R&R adopted*, 2015 WL 7430053 (N.D. Ohio Nov. 18, 2015); *cf. Meadows v. Lake Travis Indep. Sch. Dist.*, 397 F. App'x 1, 3–4 (per curium) (5th Cir. 2010) (noting that the parties provided "no caselaw for the proposition that [a parent's right to direct their child's education] extends so far as to include the unfettered right of a parent to visit all areas of a school campus while students are present").

Because Ms. Adams has failed to meet her burden to establish there is a protected interest at stake, the likelihood-of-success factor weighs against an injunction on her procedural-due-process claim.

### B.    First Amendment Retaliation

The First Amendment protects "the freedom of speech" and "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. It also "prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quotation omitted). A plaintiff bringing a First Amendment retaliation claim must establish three elements: "(1) the plaintiff engaged in protected activity, (2) the government took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing

in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Wolk v. City of Brooklyn Ctr.*, 107 F.4th 854, 859–60 (8th Cir. 2024).

Ms. Adams argues that she "engaged in protected speech and petitioning activity by communicating with District staff and administrators regarding attendance, grades, extracurricular eligibility, mental-health needs, and disability-related supports, and by filing or threatening to file complaints with oversight agencies." (Dkt. 18 at 8.) Again, Ms. Adams cites no cases to support her claim that such communications are protected activity.

As to the first element, the weight of the caselaw supports that Ms. Adams's communications with the District were not protected under the First Amendment. *See Hurwitz v. Newton Pub. Schs.*, No. CV 17-10231-LTS, 2017 WL 3008886, at *3 (D. Mass. July 14, 2017) ("[P]arents do not have a First Amendment right to unfettered access to their children's teachers."), *aff'd*, No. 17-1829, 2018 WL 11442304 (1st Cir. Dec. 20, 2018); *cf. Vukadinovich v. Bd. of Sch. Trs. of Mich. City Area Schs.*, 978 F.2d 403, 409 (7th Cir. 1992) ("Members of the public have no constitutional right of access to public schools. Vukadinovich therefore had no constitutional right of access to Rogers High School. His claim that [the school] violated his First Amendment rights by restricting his access to Rogers High School fails."); *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 281 (5th Cir. 2003) ("[T]he [Supreme] Court noted that while First Amendment protection was afforded to students and teachers, it did not extend to speech that materially disrupted classwork or involved substantial disorder or invasion of the rights of others.") (quoting *Tinker v. Des*

9

*Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)) (cleaned up); *Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 546 (D. Vt. 2014) ("[T]here is no First Amendment right of access to a school board meeting."). Insofar as Ms. Adams's asserts that her communications with the District were protected speech, she cannot carry her burden on her First Amendment retaliation claim.

On the other hand, the filing of complaints against the District is likely protected activity. *Cf. Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013) ("It is well established that the right to file a legal action is protected under the First Amendment."); *Beard v. Falkenrath*, 97 F.4th 1109, 1119 (8th Cir. 2024) (reiterating that the First Amendment protects prisoners' right to file grievances). But even assuming Ms. Adams engaged in protected speech, she fails to establish causation between that speech and any adverse actions taken by the District. "To prevail in an action for First Amendment retaliation, [a] plaintiff must show a causal connection between a defendant's retaliatory animus and plaintiff's subsequent injury." *Osborne v. Grussing*, 477 F.3d 1002, 1005 (8th Cir. 2007) (cleaned up). The record shows that Ms. Adams began threatening to file complaints against the District as early as November 2025. (Dkt. 22-1 at 2.) Between then and when the District issued the No-Trespass Order on April 7, 2026, Ms. Adams repeatedly threatened to initiate legal action or submit professional and administrative complaints against District officials and, at times, did so. In other words, Ms. Adams engaged in this conduct for months before the No-Trespass Order was issued. Left with only temporal overlap, Ms. Adams cannot support a causal link between her (liberal) use of this tactic and the No-Trespass Order. *See Recio v. Creighton Univ.*, 521 F.3d 934, 941

10

(8th Cir. 2008) ("Generally this court requires more than a mere temporal connection in order to infer causation, and the temporal connection here, six months, is not close enough to raise an inference of causation.") (citation omitted) (summary judgment order). Indeed, in both the No-Trespass Order and the Letter, the District emphasized that she "ha[d] the right to file complaints" against it and even "encouraged" her to if she had a good-faith basis for doing so. (Dkt. 8-3 at 30 ("The District will not retaliate against you for filing a complaint pursuant to federal law, state law, or District policy.").)

Because Ms. Adams has not established that the District's adverse action—here, the issuance of the No-Trespass Order—was motivated by the exercise of her right to file complaints against the District, the Court concludes that Ms. Adams is not likely to succeed on the merits of her First-Amendment retaliation claim.

### C.    Disability Retaliation

Ms. Adams's third and final claim is for disability retaliation under both the ADA and the RA, which the Court analyzes as one claim. *See Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) ("The rights, procedures, and enforcement remedies under Title II [of the ADA] are the same as under section 504 [of the RA].")); *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) ("The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and cases interpreting either are applicable and interchangeable.") (quotation omitted). To establish a prima facie case of disability retaliation, "a plaintiff must demonstrate (1) that [s]he engaged in a statutorily protected activity, (2) that an adverse action was taken against [her], and (3) a causal connection

11

between the adverse action and the protected activity." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006) (quotation omitted).

Again here, although Ms. Adams appears to have satisfied the first two elements of her claim, she fails to establish causation. More specifically, Ms. Adams engaged in ADA protected activity by seeking an accommodation for her child under Section 504 on April 2. And the school's issuance of the No-Trespass Order just days later constituted an adverse action. But, while the short time between the two events may imply a causal relationship, the record as whole undermines such an inference. As noted above, Ms. Adams and the District engaged in frequent communication for nearly six months before the No-Trespass Order was issued. Once issued, the language of the No-Trespass Order and the Letter made clear that Ms. Adams was free to continue to seek a Section 504 accommodation, which she did. And afterwards, the District continued to engage Ms. Adams in the Section 504 process, providing her the necessary information and scheduling the evaluation. The only connection between her Section 504 request and the No-Trespass Order is their temporal overlap, which is not enough given the record before the Court. *See Lundberg v. Burlington N. Santa Fe Ry. Co.*, No. 03-cv-6350 (JRT/FLN), 2006 WL 763203, at *5 (D. Minn. Mar. 24, 2006) ("The Eighth Circuit generally requires more than a temporal connection to present a genuine factual issue on [disability] retaliation.") (summary judgment order) (citing *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346 (8th Cir. 1996) (reversing mixed bench and jury trial verdict for plaintiff on retaliation claim where discrimination causation was based only on "mere coincidence of timing")). Based on the Court's careful review of the

12

record, Ms. Adams has not established the likelihood of success on the merits necessary for an injunction on her disability-discrimination claim.

## III.   Other *Dataphase* Factors

The other *Dataphase* factors also support the conclusion that injunctive relief is not appropriate at this stage. For example, Ms. Adams has not shown any risk of irreparable harm, which is "an independently sufficient basis upon which to deny a preliminary injunction." *Choreo*, 164 F.4th at 671 (cleaned up). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). To satisfy this factor, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quotation omitted). Here, as detailed in the Letter, Ms. Adams still has multiple ways to contact the District and is allowed to visit her child's school if needed. She has also continued to have conversations with District staff regarding the Section 504 process and, since the No-Trespass Order was issued, has received at least one notice from the District about her child's performance in school. (*See* Dkt. 8-3 at 32 (email to Ms. Adams notifying her of an "incident referral" that her child received in school that day).) These actions show that Ms. Adams has not been shut out of her child's education entirely.

Further, the final two *Dataphase* factors, the balance of harms and public interest, do not outweigh the other two "independently sufficient bas[e]s" for denying the Motion. *Choreo*, 164 F.4th at 671. Therefore, her Motion for a Preliminary Injunction is denied.

### ORDER

For the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff Winter Adams's Motion for a Preliminary Injunction and Temporary Restraining Order (Dkt. 8) is **DENIED**.

Date: June 18, 2026

*s/Katherine M. Menendez*
Katherine M. Menendez
United States District Judge

14